UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

George E. Woods, Jr.,

      Plaintiff,

      v.                                                  Civil Action No. 2:22–cv–8

State of Vermont; Department of Health;
Department of Corrections; Mark Levine;
Nicholas Deml; James Baker; and Thomas J.
Donovan,

      Defendants.

## <u>ORDER AND REPORT AND RECOMMENDATION</u>
(Doc. 118, 145)

Plaintiff George E. Woods, representing himself[1] and proceeding *in forma pauperis*, is

currently in custody at Northern State Correctional Facility (NSCF) in Newport, Vermont.  He

alleges constitutional claims under 42 U.S.C. § 1983 against Defendants State of Vermont; the

Vermont Department of Health (DOH); the Vermont Department of Corrections (DOC); DOH

Commissioner Mark Levine; DOC Commissioner Nicholas Deml; former DOC Commissioner

James Baker; and Thomas J. Donovan, former Attorney General of the State of Vermont.

Woods's claims arise from restrictions imposed in DOC facilities in the 2020–2021 timeframe in

---

[1] Although Woods captions the Complaint a "Class Action Civil Action" (Doc. 5 at 1), only Woods signed the Complaint.  Attached to the Complaint is an exhibit containing approximately 50–55 signatures of other individuals incarcerated in Vermont.  (Doc. 5-1.)  In a September 2, 2022 Order, the Court determined that this action could not proceed as a class action because Woods is not an attorney and as a non-lawyer cannot represent the interests of anyone else.  (Doc. 127.)  Having determined that Woods was the only Plaintiff in the case, the Court denied without prejudice the request to add plaintiffs to the Complaint until the Court issued a decision on Defendants' Motion to Dismiss the Complaint.  (*Id.* at 2–3.)  The Complaint contains references to the alleged constitutional deprivations experienced by "plaintiffs" or "inmates" collectively.  As Woods is the only Plaintiff at the present time, this Report and Recommendation considers the sufficiency of the Complaint allegations only as they pertain to Woods.

response to the COVID-19 pandemic.  He asserts that Defendants have violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.  Woods seeks nominal damages, compensatory and punitive damages for the allegedly unconstitutional conduct, and injunctive relief to prevent the continuing violation of his rights.

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) for failure to state a claim against the State of Vermont, DOH, DOC, and the Commissioners in their official capacities.  Defendants also move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted.

For the reasons explained below, I recommend that Defendants' Motion to Dismiss (Doc. 118) be GRANTED.  If Woods's Complaint is dismissed, I recommend that he be granted leave to amend his Complaint.  Woods has also requested that this matter be set for a status conference.  (Doc. 145.)  Given the recommendation that the Complaint be dismissed with leave to amend, the Court DENIES the request at this time.

## Background

### I.    Woods's Allegations

Woods alleges that on April 22, 2020, he was placed in the NSCF segregation unit for a two-week quarantine period.  (Doc. 5 at 3, ¶ 4.)  This period of quarantine allegedly resulted in certain deprivations, including "no use of the phones;" "no use of legal material to defend any legal matters;" "no recreation period, besides a 10 minute shower;" "no communication w[ith] the people in society;" "hardly no hot food;" "no radio;" "no news or TV access;" and "no visits."  (*Id*.)  The Complaint further alleges that "[s]ince 4/22/2021 . . . [t]he Defendants, while in the COVID-19 mandated State Actions have caused [t]he Plaintiffs [a]-typical significant

hardships and have strip[p]ed [t]he Plaintiffs from many rights under our U.S. Constitution." (*Id.* at 4, ¶ 5.)[2]  Woods alleges that he was "personally harmed" when he "contracted COVID-19 from a correctional officer at NSCF," which allegedly resulted in two seizures and a "split . . . eyebrow" during one seizure. (*Id.* at 10.)  To the extent that Woods makes additional factual allegations, the facts are set forth in the analysis of each constitutional claim below.

## Discussion

### I.      Standards of Review

Courts afford pleadings filed by self-represented parties "special solicitude." *See Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (internal quotation marks omitted).  The court is required to read a self-represented plaintiff's complaint liberally and to hold it "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted); *see also McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (explaining courts "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest" (internal quotation marks omitted)).

A case is properly dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "if the court 'lacks the statutory or constitutional power to adjudicate it.'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "[T]he party asserting federal [subject matter] jurisdiction bears the burden of establishing jurisdiction"

---

[2]  Woods alleges additional facts in his "Motion to Object" (Doc. 149), which is an unauthorized sur-reply to Defendants' Motion to Dismiss.  *See* Local Rule 7.  However, this Report and Recommendation does not consider new facts raised for the first time in an opposition brief and not pleaded in the Complaint.  *See Neisner v. Town of Killington*, No. 1:16-cv-4-jgm, 2016 WL 7441637, at *2 (D. Vt. Dec. 27, 2016) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss.").

exists.  *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks omitted).  If subject matter jurisdiction is lacking, however, the court cannot proceed further.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

In adjudicating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept as true all of the allegations contained in a complaint" and determine whether the complaint states a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  All complaints must contain "sufficient factual matter . . . to state a claim . . . ." *Id.* (internal quotation marks omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*  Although the court must interpret a *pro se* complaint liberally, the complaint nevertheless must include sufficient factual allegations to satisfy the facial plausibility standard.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

## II.     42 U.S.C. § 1983

Under § 1983, a plaintiff may bring suit against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  In order to state a claim under § 1983, a plaintiff must plausibly plead "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived [the plaintiff] of that right acted under color of state . . . law.'" *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (omission in original) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Woods does not specify whether he asserts his § 1983 claims against Defendants in their official or individual capacities.  Therefore, the Court construes the Complaint as alleging both official- and individual-capacity claims.  *Roberts v. Vermont Dep't of Corr.*, Civil Action No. 2:16-cv-135-cr-jmc, 2017 WL 2189707, at *4 (D. Vt. Apr. 4, 2017) (observing that "where a *pro se* litigant does not specify in what capacity the individual defendants are being sued, courts generally liberally construe the complaint as alleging both official and individual capacity claims" (internal quotation marks and citation omitted)).

## III.   Defendants' Motion to Dismiss Under Rule 12(b)(1)

Defendants' Motion to Dismiss under Rule 12(b)(1) should be granted because (1) none of the Defendants in their official capacities are "persons" under § 1983; (2) sovereign immunity bars suits for money damages against the State of Vermont and its agency officers sued in their official capacities; and (3) sovereign immunity bars injunctive relief against DOC.

**A.** **The State of Vermont, DOH, DOC, the agency Commissioners, and former Attorney General sued in their official capacities are not "persons" subject to liability under § 1983.**

Woods's claims under § 1983 against the State of Vermont, DOH, DOC, the agency Commissioners and former Attorney General Donovan in their official capacities should be dismissed because each is not a "person" subject to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

Therefore, the State of Vermont, the state agencies, and the Commissioners and Attorney General in their official capacities are not subject to liability because they are not "persons" under § 1983.

**B.** **Sovereign immunity bars suits for money damages against the State and its officers in their official capacities.**

The Eleventh Amendment bars Woods's claims for monetary damages against the State of Vermont, the state agencies, and the Commissioners and Attorney General in their official capacities. The Supreme Court has interpreted the Eleventh Amendment to bar private suits for retrospective relief against a State in federal court, absent consent to suit by the State or valid congressional abrogation of this immunity. *See Alden v. Maine*, 527 U.S. 706, 754 (1999) ("Our sovereign immunity precedents establish that suits against nonconsenting States are not properly susceptible of litigation in courts, and, as a result, that the entire judicial power granted by the Constitution does not embrace authority to entertain such suits in the absence of the State's consent. . . .") (cleaned up); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[A]n unconsenting State is immune from suits brought in federal courts by her own

citizens as well as by citizens of another state.") (internal quotation marks omitted)); *cf. Hans v. Louisiana*, 134 U.S. 1, 17 (1890) ("Undoubtedly a state may be sued by its own consent . . . .").

The State of Vermont has not waived its sovereign immunity in this § 1983 suit for money damages in federal court. *See* 12 V.S.A. § 5601(g) (expressly reserving the State's Eleventh Amendment rights). Nor has Congress abrogated Vermont's immunity by enactment of § 1983. *Will*, 491 U.S. at 67 (holding that in enacting § 1983, Congress did not abrogate state sovereign immunity under the Eleventh Amendment). As a result, Woods may not sue the State of Vermont, or its agencies or employees acting in their official capacities, for money damages in federal court. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State. . . . [T]he only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses."); *see also Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020), *abrogated on other grounds by N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("An action against a state official in his official capacity is deemed an action against the state itself, which possesses sovereign immunity under the Eleventh Amendment." (citations omitted)).

Because Woods seeks money damages against the State, the state agencies, and the Commissioners and the former Attorney General in their official capacities, his claims should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

### C.    Sovereign immunity bars Woods's request for injunctive relief against DOC.

In addition to compensatory and punitive damages, Woods seeks an injunction to prevent DOC from continuing to violate his constitutional rights. (Doc. 5 at 13.)

The Eleventh Amendment bars injunctive relief against a state and its agencies. *Woods v. Rondout Valley Cent. Sch. Dist. Bd. Of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ("The immunity

recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (internal quotation marks omitted)); *Cory v. White*, 457 U.S. 85, 91 (1982) (explaining that "the Eleventh Amendment by its terms clearly applies to a suit seeking an injunction, a remedy available only from equity"); *see also Mulready v. Mulready*, Civil No. 3:06CV00934(AWT), 2007 WL 1757055, at *2 (D. Conn. June 19, 2007) ("Unless the state has waived its sovereign immunity, or its immunity is validly abrogated by statute, the plaintiff cannot sue the state or its agencies either for monetary damages or injunctive relief."). Accordingly, Woods's claim for injunctive relief against DOC should be dismissed on sovereign immunity grounds.

Construed liberally, the Complaint may be requesting injunctive relief against the individual Defendants in their official capacities—Mark Levine, James Baker, Nicholas Deml, and Thomas J. Donovan. "[U]nder the *Ex parte Young* doctrine, the Eleventh Amendment does not bar a 'suit against a state official when that suit seeks . . . prospective injunctive relief.'" *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 448 (E.D.N.Y. 2002) (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996)). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as 'prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)). Woods does not assert sufficient facts demonstrating an ongoing violation of federal law. The Complaint references a fourteen-day period of quarantine beginning on April 22, 2020 and describes a series of restrictions related to the quarantine period. (Doc. 5 at 3, ¶ 4.) To the extent that Woods's constitutional claims pertain to that

timeframe, the alleged violations are not ongoing because the quarantine period ended almost three years ago.  Therefore, prospective injunctive relief is not warranted under these circumstances.

To the extent that Woods alleges that prison conditions during the COVID-19 pandemic caused constitutional violations more generally, the Complaint lacks factual detail as to the specific prison policies giving rise to the alleged deprivations and Woods's resulting injuries.  He alleges that "[s]ince 4/22/2021 . . . [t]he Defendants, while in the Covid-19 mandated State Actions have caused [t]he Plaintiffs [a]-typical significant hardships and have strip[p]ed [t]he Plaintiffs from many rights under our U.S. Constitution."  (Doc. 5 at 4, ¶ 5.)  He does not identify the alleged state mandates in the correctional setting that resulted in constitutional violations.  Therefore, the Court is unable to discern the nature of any alleged ongoing violation of federal law that is appropriate for injunctive relief.

In addition, other than by virtue of their leadership roles in the identified state agencies, Woods does not allege how the named individual Defendants are responsible for the alleged constitutional violations.  It is well-settled that "th[e] exception under *Ex parte Young* only applies where the official sued has 'some connection with the enforcement of the [allegedly unconstitutional act].'"  *Kuck v. Danaher*, 822 F. Supp. 2d 109, 141 (D. Conn. 2011) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).  Defendant Baker is no longer the Commissioner of Corrections and therefore cannot be responsible for any alleged ongoing violations.  As Woods notes, DOC Commissioner Deml has been in that position since November 1, 2021.  (Doc. 5 at 2, ¶ 3.)  Given the lack of clarity in the Complaint as to the time frame of the alleged violations, and the specific policies alleged to be the cause of the violations, the Court cannot discern whether Woods plausibly claims an ongoing violation since Deml became DOC Commissioner.  In

addition, the Complaint does not describe in any detail how Deml was personally involved in causing the alleged violations.  Similarly, the Complaint makes no allegations showing how Commissioner Levine and former Attorney General Donovan were personally involved in causing a violation of Woods's constitutional rights.  General and undifferentiated allegations that Defendants acted under an unidentified COVID-19 policy at a non-specific time are insufficient to state a plausible claim of an ongoing violation warranting injunctive relief against the individual Defendants in their official capacities.

## IV.     Defendants' Motion to Dismiss Under Rule 12(b)(6)

Defendants' Motion to Dismiss under Rule 12(b)(6) should be granted because (1) the Complaint does not allege the personal involvement of Defendants to sustain individual-capacity claims against them; (2) the Complaint does not plausibly allege that the challenged restrictions were not reasonably related to legitimate penological interests; and (3) the Complaint does not state claims for violations of the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.

### A.     Woods has not stated individual-capacity claims against the Commissioners and former Attorney General because the Complaint largely alleges only legal conclusions without factual content to permit the Court to reasonably infer liability for the alleged misconduct.

To the extent that Woods seeks to allege § 1983 claims against the agency Commissioners and former Attorney General Donovan in their individual capacities, the claims should be dismissed because he has not alleged the personal involvement of these Defendants in the alleged constitutional violations.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013)).  A defendant may therefore only be held accountable for his own actions under § 1983, *see Iqbal*, 556 U.S. at 683, and the

plaintiff must show some "tangible connection" between the constitutional violation alleged and that particular defendant, *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

To the extent that the Complaint might be alleging that the individual Defendants are liable to Woods under a theory of supervisory liability, i.e., pursuant to their roles as Commissioners, the claims are without merit.  The allegations against these Defendants must show some level of personal involvement, given that supervisory liability in a § 1983 action cannot rest merely on a theory of respondeat superior.  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003); *see Tangreti v. Bachmann*, 983 F.3d 609, 617 (2d Cir. 2020) ("[A] conception of supervisory liability—according to which a supervisor may be held liable based on a lesser showing of culpability than the constitutional violation requires—is inconsistent with the principle that officials may not be held accountable for the misdeeds of their agents." (internal quotation marks omitted)).  In the Second Circuit, mere "linkage in the prison chain of command" is insufficient to implicate a state commissioner of the Department of Corrections in a § 1983 claim.  *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *see Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant in a § 1983 action may not be held liable for constitutional violations merely because he held a high position of authority).

Prior to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit identified "five categories of evidence that [could] establish the liability of a supervisory official for a subordinate's conduct" under § 1983.  *Tangreti*, 983 F.3d at 616.[3]  The Second Circuit has since clarified the standard that applies to supervisory liability claims in light of *Iqbal*:

---

[3]  These categories consisted of: (1) direct participation in the constitutional violation; (2) failure to remedy the violation after learning of it through a report or appeal; (3) creating or allowing to continue a policy or custom amounting to a constitutional violation; (4) being grossly negligent in supervising subordinates who committed a constitutional violation; or (5) failure to act on information indicating that unconstitutional acts were occurring. *Tangreti*, 983 F.3d at 616.

> [A]fter *Iqbal*, there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.  The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly.

*Tangreti*, 983 F.3d at 618 (second alteration in original) (citations and internal quotation marks omitted); *see Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Throughout the Complaint, Woods alleges generally that "defendants" and "DOC officials" are responsible for the infringements on his constitutional rights.  (Doc. 5 at 3, 4, 5, 6, 7, 9, 10, 12, 13.)  However, the Complaint does not contain any specific allegations describing the personal involvement of any Defendant in the alleged misconduct.  Commissioner Levine and former Attorney General Donovan are not referenced in any of the factual allegations in the Complaint.  Woods also does not allege any personal involvement of former Commissioner Baker and Commissioner Deml.  It appears that Woods seeks to hold Baker and Deml liable based on their managerial role in the DOC.  As explained above, a plaintiff may not state an individual-capacity claim against the Commissioners simply because of their supervisory roles in their respective agencies.  Woods may be alleging that the Commissioners are liable because of the prison policies that resulted in the alleged constitutional violations.  Although Woods suggests that the correctional facility imposed COVID-19 restrictions, he does not specify the policy, rule, or custom that allegedly violated Woods's constitutional rights.  Nor does he allege that any of the Defendants are responsible for the contested policies.  Therefore, the allegations are insufficient to allege the personal involvement of Baker or Deml for purposes of a § 1983 claim.

I recommend that Woods's claims against Commissioners Levine and Deml, former Commissioner Baker, and former Attorney General Donovan in their individual capacities be dismissed for failure to plausibly allege their personal involvement in the allegedly unconstitutional conduct.

> **B.    Woods's Complaint should be dismissed because it does not plausibly allege that the challenged DOC policies were not reasonably related to legitimate penological interests and in any event it does not state plausible constitutional claims.**

Woods contends that certain COVID-19 restrictions in the correctional facility resulted in the infringement of his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 5 at 4.)  The Complaint does not raise viable claims under the Fifth Amendment.  It is well settled that the Fifth Amendment's protections apply to actions by the federal government.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see also Mazzone v. Town of Southampton*, 283 F. Supp. 3d 38, 47 (E.D.N.Y. 2017) (noting that "the Due Process Clause of the Fifth Amendment only applies to actions by the Federal Government" (internal quotation marks omitted)), *report and recommendation adopted as modified*, 2017 WL 6017357 (E.D.N.Y. Dec. 1, 2017).  As Woods does not assert any claims against federal actors, he has not alleged a Fifth Amendment claim.[4]

### 1.    COVID-19 Restrictions and Legitimate Penological Interests

As the Supreme Court has recognized, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84

---

[4] The basis for Woods's Sixth Amendment claim is not clear.  To the extent he may be asserting a Sixth Amendment violation based on his access-to-court claim, the claim should be dismissed for the reasons stated in Part IV.B.2.c. of this Report and Recommendation.  If he is premising his Sixth Amendment claim on the assertion that prison caseworkers do not distribute "motions from attorneys" in a timely manner (Doc. 5 at 7), this bare factual allegation is insufficient to state a claim.  Woods provides no facts suggesting that he has been actually injured by the alleged delayed distribution of motions.  As the claim is vague and conclusory, it should be dismissed.

(1987).  The Court has further acknowledged, however, that courts are "ill equipped to deal with the increasingly urgent problems of prison administration," and the "problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree."  *Id.* (internal quotation marks omitted).  The Court has attempted to strike a balance between the "need to protect constitutional rights" and "the policy of judicial restraint regarding prisoner complaints."  *Id.* at 85. (internal quotation marks omitted).  Therefore, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Id.* at 89.  "[S]uch a standard is necessary if prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations."  *Id.* (internal quotation marks omitted); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.") "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  *Overton*, 539 U.S. at 132.

Courts have dismissed constitutional claims brought under § 1983 when the inmate has not alleged facts showing that the challenged policy or regulation was not reasonably related to legitimate penological interests.  *See, e.g.*, *Harris v. Polis*, No. 20-cv-2999-CMA-STV, 2021 WL 3024664, at *4 (D. Colo. June 23, 2021) (dismissing free exercise of religion claim where "Plaintiff has not pled facts to suggest that such [lockdown conditions] were otherwise irrational or done with the intention of burdening his religious beliefs"), *report and recommendation adopted*, 2021 WL 3021466 (July 16, 2021).

Woods has not alleged facts plausibly suggesting that the challenged DOC regulation or policy was not reasonably related to legitimate penological interests.  He faults DOC for apparently imposing a general quarantine instead of implementing a testing regime to determine which inmates should have been quarantined.  (Doc. 5 at 3.)  But Woods's disagreement with DOC's approach to managing COVID-19 risk in prisons is insufficient to allege that quarantine was not reasonably related to legitimate penological interests.  He also appears to suggest that DOC's COVID-19 restrictions were arbitrary given that the "State allows non-vaccinated officers and personnel into the facility and have full access to every [b]uilding, unit and cell while the same officials restrict [inmates] from visits with . . . friends and family."  (Doc. 5 at 4.) Apart from the conclusory and inherently speculative nature of the claim, particularly as to the vaccinated status of the unidentified individuals, it is again insufficient to allege that DOC protocols directed at the management of COVID-19 risk among the larger inmate population were not reasonably related to legitimate penological interests.[5]

Moreover, as explained below, Woods has not stated substantive claims under the First, Eighth, and Fourteenth Amendments.

## 2.    First Amendment Claims

Woods appears to assert violations of his First Amendment rights because the DOC has implemented the following restrictions: (1) prohibiting visitation by family; (2) denying religious services; and (3) denying access to the law library, thereby preventing his access to the courts. (Doc. 5 at 4–7.)

---

[5]  Woods acknowledges that the restrictions at NSCF were imposed "because of safety reasons . . . due to Covid," but he appears to "question" whether the restrictions were justified.  (Doc. 5 at 5.)

a.        **Right to Visitations**

Woods asserts that DOC has restricted visitation due to COVID-19 concerns (Doc. 5 at 5), suggesting that such restrictions violate his right of association under the First Amendment. The Supreme Court has observed that "[a]n inmate does not retain rights inconsistent with proper incarceration," and "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131.  The Constitution "protects certain kinds of highly personal relationships," and there is "a right to maintain certain familial relationships, including association among members of an immediate family." *Id*. (internal quotation marks omitted). Nevertheless, "[s]ome curtailment of that freedom must be expected in the prison context." *Id*. To the extent that a prison policy restricts an inmate's freedom to associate, courts will not find a constitutional violation if the policy "bear[s] a rational relation to legitimate penological interests." *Id*. at 132.  Courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id*.  As relevant here, *Overton* considered the existence of a First Amendment right to visitation for inmates but declined "to explore or define the . . . right of association at any length or determine the extent to which it survives incarceration." *Id*.  Second Circuit caselaw also does not clearly establish a prisoner's right to visitation under the First Amendment.  *See Malave v. Weir*, 750 F. Appx. 65, 67 (2d Cir. 2019) (summary order) (noting that "*Overton* did not consider whether there is a First Amendment right to visitation in prison").

Woods alleges only that visitation has been "restricted," but he provides no further detail as to the nature of the restrictions, the duration of the restrictions, or whether alternative means of communication were made available to him.  *See Hernandez v. McGinnis*, 272 F. Supp. 2d

223, 228 (W.D.N.Y. 2003) (upholding facility's suspension of visitation rights in part because inmate was able to communicate with persons outside the facility by letter and telephone). Woods does allege that he was denied "communication w[ith] the people in society" and use of the telephone during his fourteen-day quarantine in 2020 (Doc. 5 at 3), but this is insufficient to state a plausible First Amendment claim.  Although in different circumstances to that presented here, the Supreme Court has held that a lengthier visitation restriction does not support a constitutional claim.  *See Overton*, 539 U.S. at 133–34 (upholding restriction of up to two years on visitation for inmates incurring two substance-abuse violations).  There are simply insufficient facts in the Complaint to determine the facial plausibility of any claim.  Finally, Woods does not allege any personal involvement of Defendants in the allegedly unjustified restriction on visitation.

### b.      Right to Religious Services

A plaintiff alleging that a prison policy burdens his right to freely exercise his religion must show (1) "that he has a sincerely held religious belief," (2) "that it was substantially burdened," and (3) "that [the defendants'] conduct was not reasonably related to some legitimate penological interest."  *Barnes v. Furman*, 629 F. App'x. 52, 55 (2d Cir. 2015) (summary order) (citing *Holland v. Goord*, 758 F.3d 215, 220-23 (2d Cir. 2014)).  A substantial burden on a sincerely held religious belief is established where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (internal quotation marks omitted).  The substantial burden determination requires the court to consider "whether participation in the [religious activity], in particular, is considered central or important to [plaintiff's religious] practice."  *Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003).  A plaintiff does not show substantial burden to his sincerely held religious

beliefs by pointing to a government policy that "inconveniences" his exercise of religion. Rather, the alleged interference "must rise to the level of burden[ing] a belief central to plaintiff's religious doctrine." *McLeod v. Williams*, No. 18-CV-115 (RA), 2020 WL 2512164, at *4 (S.D.N.Y. May 15, 2020) (internal quotation marks omitted).  Nevertheless, a policy that substantially burdens religious belief may be constitutional "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (internal quotation marks omitted).  In assessing the reasonableness of the contested policy or regulation, courts consider whether alternative means of religious expression are available to the plaintiff.  *See id.* at 351–52 (finding disputed restrictions reasonable in part because Muslim inmates "are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

Woods does not state a plausible First Amendment claim simply by alleging that DOC "has stop[p]ed religious services."  (Doc. 5 at 5); *see Harris*, 2021 WL 3024664, at *4 (dismissing prisoner's free exercise claim when plaintiff plea[ded] only as a general matter that access to religious services has been impacted by the lockdown . . . [h]e d[id] not identify his religious beliefs, nor d[id] he identify how the alleged changes impacted such beliefs").  Woods does not allege any facts related to his particular religious belief and how the alleged restrictions have substantially burdened his belief.  He instead makes general and conclusory allegations without explaining how the alleged restriction has injured him personally: "No one can be deprived of this right to have religious services, as the spiritual connection with others is healthy[,] healing[,] and rehabilitative."  (Doc. 5 at 5.)  The Complaint also does not allege when this restriction was instituted and its duration.  It does not provide any information pertaining to whether alternative means of religious expression remain available to him despite the restriction.

Therefore, the Complaint fails to state a claim for infringement of Woods's First Amendment right to practice his religion.

### c.    Access to the Courts

Woods alleges that DOC officials "have denied access to the law library, prevented access to the courts by not allowing emergency filings, altered and destroy[ed] evidence and violate[d] the due process of the prisoner." (Doc. 5 at 7.)  He further alleges that "DOC . . . has prevented access to copies at times," and apparently has delayed the making of copies "on numerous occasions in retaliation." (*Id.*)  According to Woods, "the pattern of this abuse has become continuous," and "has in fact prolonged incarcerative stays for plaintiffs." (*Id.* at 7–8.)

It is well established that prisoners have "a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996).  This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828.  "But the Supreme Court has likewise instructed that '*Bounds* did not create an abstract, freestanding right to a law library or legal assistance.'" *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004) (quoting *Lewis*, 518 U.S. at 351); *see also Oliver v. Head Sheriff of Dep't & Div. of Corr.*, No. 07-CV-4355 (NG), 2008 WL 238577, at *2 (E.D.N.Y. Jan. 28, 2008) (observing that "the Constitution does not require unlimited and unrestricted access to a law library at the demand of a prisoner").

Rather "[t]he right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*." *Bourdon*, 386 F.3d at 93 (alteration in original) (quoting *Lewis*, 518 U.S. at 350).  A prisoner does not have a constitutional right to access the prison law library, but he may establish a violation of his right to access the courts if he demonstrates "that the alleged

shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351.  An access-to-courts claim requires that the plaintiff allege: "(1) a valid underlying cause of action separate from the right-of-access claim; and (2) frustration or hindrance of the litigation caused by the defendant's actions." *Fusco v. Westchester Cnty. Dep't of Corr.*, 21-CV-1943 (CM), 2021 WL 1254215, at *3 (S.D.N.Y. Apr. 1, 2021) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)); *see also Fredricks v. Parilla*, 21-CV-1893 (LTS), 2021 WL 2227095, at *2 (S.D.N.Y. June 1, 2021) (requiring that plaintiff demonstrate the defendant's conduct was "deliberate and malicious").  "[D]elay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Fusco*, 2021 WL 1254215, at *3 (internal quotation marks omitted).

Woods has not pleaded facts indicating that he has been unconstitutionally denied his right to access the courts.  The Complaint asserts conclusory allegations that unspecified DOC officials have prevented access to the courts by not allowing emergency filings; altering and destroying evidence; and delaying copies of documents.  (Doc. 5 at 7–8.)  These allegations are vague and not specifically related to Woods himself.  He does not assert, for example, that the alleged restriction has frustrated his own efforts to pursue legal claims in court.  Courts have dismissed access-to-courts claims where the plaintiff "does not allege which specific, nonfrivolous legal challenges were affected by [the plaintiff's] inability to access [the law library system]; which particular deadlines, if any, he missed due to such actions; or what specific documents, such as motions or pleadings, he was prevented from filing." *Washington v. Falco*, 20 CV 3009 (VB), 2021 WL 797658, at *8 (S.D.N.Y. Mar. 1, 2021).  Nor does Woods claim that DOC officials have destroyed *his* documents or evidence, prohibited him from making emergency filings, or retaliated against him in a manner that adversely affected one of his own

court cases. Rather, the Complaint appears to advance general access-to-court claims on behalf of other unidentified individuals.

In sum, Woods has not alleged any facts demonstrating the personal impact of the alleged restriction on law library access, such as missed deadlines or inability to file court documents. He has not alleged any facts demonstrating that he suffered an actual injury in the litigation of any pending matter due to the alleged lack of access to the prison law library. Therefore, the access-to-the-courts claim should be dismissed for failure to state a claim.

### 3.      Eighth Amendment Claims

Woods alleges that conditions of confinement have caused him to endure "significant hardships" in prison that rise to the level of an Eighth Amendment violation. (Doc. 5 at 4, 9.)

Conditions of confinement may violate the Eighth Amendment if they "'deprive prisoners of the minimal civilized measure of life's necessities.'" *Walker v. Schult*, 45 F.4th 598, 611 (2d Cir. 2022) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). An Eighth Amendment violation may result when conditions of confinement cause a "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. In order to state a claim under the Eighth Amendment for deliberate indifference based on conditions of confinement, a plaintiff must plead sufficient facts to satisfy the objective and subjective elements of the claim. Under the objective element, the plaintiff must allege that he was incarcerated under conditions posing a substantial risk of serious harm. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). The subjective element requires that "the charged official must act with a sufficiently culpable state of mind." *Id.* "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* "[A] prison official does not act in a deliberately indifferent manner unless that

official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* (internal quotation marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (subjective element requires allegation that defendant knew that there was a "substantial risk" to plaintiff's health and "disregard[ed] that risk by failing to take reasonable measures to abate it").

### a.      Food Quantity and Quality

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal quotation marks omitted).  "While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Id.* (citation omitted).

Woods's allegations as to food consist of the following: (1) DOC has not provided a sufficient quantity of food; (2) DOC has not provided prisoners food that meets FDA-approved health standards; and (3) DOC has not provided prisoners "hot food."  (Doc. 5 at 6.)  With respect to quantity of food, Woods has alleged no facts to substantiate the conclusory claim that he has been deprived sufficient food.  Similarly, he has not alleged any facts demonstrating that food in the prison is nutritionally inadequate.  *Cf. Phelps v. Kapnolas*, 308 F.3d 180, 182, 186 (2d Cir. 2002) (finding Eighth Amendment allegations sufficient where plaintiff's restricted diet of "raw cabbage and a bread-like loaf that appeared to contain ground vegetables" over a two-week period allegedly caused him to lose thirty pounds and suffer severe abdominal pain,"

among other consequences).  As to Woods's claim regarding the temperature of food served in

the prison, "[t]he provision of cold food is not, by itself, a violation of the Eighth Amendment"

so long as the food provided is nutritionally adequate and does not endanger the health of the

prisoner.  *Waring v. Meachum*, 175 F. Supp. 2d 230, 239 (D. Conn. 2001); *see also Brown-El v.*

*Delo*, 969 F.2d 644, 648 (8th Cir. 1992) ("We agree with the district court that [plaintiff's] claim

that his constitutional rights were violated when he was served cold food is frivolous").  There is

no indication in the Complaint that the alleged temperature of the food has harmed Woods's

health.  For example, he does not claim that food is regularly undercooked or otherwise unsafe to

eat because of its temperature.  Finally, as noted above, Woods has not alleged that any of the

named Defendants personally participated in the alleged deprivations pertaining to food, a

requirement to state a supervisory liability claim under § 1983.

### b.   Recreation

"Courts have recognized that some opportunity for exercise must be afforded to

prisoners."  *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985).  "[D]eprivations of physical

exercise for short periods will not rise to constitutional dimension," but deprivation of physical

exercise over a period of weeks may be sufficient to state a claim.  *McCray v. Lee*, 963 F.3d 110,

117-18 (2d Cir. 2020) (citing Seventh Circuit case reversing dismissal of complaint alleging a

seven-week deprivation of exercise).  In *McCray*, the Second Circuit held that the plaintiff had

sufficiently alleged an Eighth Amendment claim when he asserted a denial of physical exercise

over a four-month period.  *Id.* at 117–18, 120.

Woods alleges only that "DOC officials . . . restricted outside recreation and [a]

reasonable amount of time out of our cells."  (Doc. 5 at 6.)  He further asserts that "[p]risoners

cannot be deprived of outside exercise for long periods of time."  (*Id.*)  However, he does not

offer any facts specifically describing the restriction on recreation or its extent and duration. Therefore, the Court cannot determine whether his exercise claim "rise[s] to constitutional dimension." *McCray*, 963 F.3d at 117.  Even assuming the claim was constitutionally cognizable, Woods has not alleged that any of the Defendants were aware of the condition and refused to take any action, i.e., that they were deliberately indifferent.

### 4.   Fourteenth Amendment Claims

An incarcerated individual "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986).  "To present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (internal quotation marks omitted). Woods does not explain the nature of the asserted Fourteenth Amendment claim.  To the extent that Woods is claiming he was deprived of his First and Eighth Amendment rights in violation of the procedural protections contained in the Fourteenth Amendment, as explained above, he has not plausibly alleged substantive claims under the First and Eighth Amendments.  Therefore, those claims may not serve as a basis for an alleged Fourteenth Amendment violation.

The essence of Woods's Complaint is that facility restrictions due to "COVID-19 mandated State actions" resulted in segregation of inmates and associated limitations on visitation and recreation, among other limitations addressed above.  (Doc. 5 at 4.)  Therefore, Woods may be claiming that NSCF restrictions—including the period of quarantine described in the Complaint and subsequent limitations—violated his Fourteenth Amendment liberty interests. As the Second Circuit has explained, "[t]he United States Constitution does not create any protected liberty interest in remaining in the general prison population." *Smith v. Coughlin*,

24

748 F.2d 783, 787 (2d Cir. 1984).  "As long as the conditions or degree of confinement to which

the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative

of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by

prison authorities to judicial oversight."  *Id*. (internal quotation marks omitted).  Nevertheless,

"the state by its own constitution, statutes, regulations, or judicial decisions may create a

protected interest in remaining within the general prison population."  *Id*.  In order to

demonstrate a state-created liberty interest, an inmate must show that "state statutes or

regulations require, in language of an unmistakably mandatory character, that a prisoner not

suffer a particular deprivation absent specified predicates."  *Vega v. Lantz*, 596 F.3d 77, 83 (2d

Cir. 2010) (internal quotation marks omitted).

Woods has not alleged a specific liberty interest implicating the procedural protections of

the Fourteenth Amendment.  Defendants contend that no provision of Vermont law creates such

a protected liberty interest.  (Doc. 118 at 19–20.)  Vermont law generally affords an inmate the

right to a hearing before placement into administrative segregation.  28 V.S.A. § 857(a).

However, "[i]n the event of an emergency situation and at the discretion of the Commissioner, an

inmate may be placed in administrative segregation prior to receiving a hearing."  *Id*. § 857(b).

Woods's Complaint alleges that his fourteen-day quarantine in the facility occurred during

"COVID-19 mandated State actions."  (Doc. 5 at 4.)  Woods has not plausibly alleged that he

had a protected liberty interest in remaining in the general prison population during the period

when DOC was implementing protocols to address the health risks occasioned by the COVID-19

pandemic.  Finally, the allegations in the Complaint do not suggest that Woods was treated

differently from other inmates during the relevant timeframe.  Rather, as the Complaint initially

purported to be filed as a "class action," the alleged restrictions appear to have been broadly applied in the facility.

Therefore, Woods has not stated a Fourteenth Amendment claim for deprivation of a protected liberty interest without due process.

### C.   Leave to Amend

District courts should not dismiss the complaint of a self-represented party without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted). A court need not grant leave to amend, however, if "amendment would be futile." *Garcia v. Super. of Great Meadow Corr. Facility*, 841 F.3d 581, 583 (2d Cir. 2016) (per curiam) (cautioning that a district court "should not dismiss a pro se complaint without granting leave to amend at least once, unless amendment would be futile") internal quotation marks omitted)). "Amendment is futile where the problems with the complaint's claims are substantive and not the result of inartful pleading." *Biswas v. Rouen*, 808 F. App'x 53, 55 (2d Cir. 2020) (summary order) (cleaned up).

In light of Woods's self-represented status and the governing law on leave to amend, I recommend that he be afforded an opportunity to amend his Complaint. Woods is advised that an Amended Complaint, if filed, will supersede and completely replace the original Complaint. *See Hancock v. County of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018) (noting "it is well settled that an amended pleading ordinarily supersedes the original and renders it of no legal effect") (cleaned up). An Amended Complaint must include all of his factual allegations in their entirety and must set forth all the claims he has against all defendants and all the relief he seeks. Equally important, an Amended Complaint must comport with the Federal Rules of Civil Procedure,

including setting forth short and plain statements of each claim as required by Rule 8, and doing so in consecutively numbered paragraphs as required by Rule 10.  However, should the Court grant leave to amend, I caution Woods that an Amended Complaint will not provide the Court with subject matter jurisdiction over claims that are barred by sovereign immunity, as explained above.

## V.     Motion for Status Conference

Woods has requested that this matter be set for a status conference.  (Doc. 145.)  Given the recommendation that the Complaint be dismissed with leave to amend, the Court DENIES the request at this time.

### Conclusion

For the reasons discussed above, I recommend that Defendants' Motion to Dismiss (Doc. 118) be GRANTED.[6]  I further recommend that, if this Report and Recommendation is adopted by the Court, Woods be granted thirty days to file an amended  complaint.  In the event an amended complaint is not filed within that timeframe, the case should be closed.  The Motion for a Status Conference (Doc. 145) is DENIED without prejudice.

Dated at Burlington, in the District of Vermont, this 28th day of February 2023.

/s/ Kevin J. Doyle
Kevin J. Doyle
United States Magistrate Judge

---

[6]  To the extent that Woods is asserting supplemental state-law claims under Vermont's Tort Claims Act (Doc. 5 at 1) (citing 12 V.S.A. §§ 5601 and 5602), those claims should be dismissed given the recommendation that the federal claims be dismissed.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).